**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **RICHARD R.,[1]** | |
|      **Plaintiff,** | |
| **v.** | **Case No. 3:22-CV-00885-NJR** |
| **KILOLO KIJAKAZI, Acting Commissioner of Social Security,** | |
|      **Defendant.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Richard R. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is reversed and remanded for rehearing and reconsideration of the evidence.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on November 6, 2019, alleging an onset date of August 27, 2019. (Tr. 71, 181). The application was initially denied on March 30, 2020 (Tr. 85-89), and it was denied upon reconsideration on September 15, 2020. (Tr. 96-99). Plaintiff timely requested a hearing, and Administrative Law Judge Michael Scurry ("ALJ") held a hearing on January 12, 2021, at which Plaintiff, his attorney, and a vocational expert appeared. (Tr. 31-61).

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

The ALJ issued an unfavorable decision on February 1, 2021, finding that Plaintiff was not disabled because he had the residual functional capacity ("RFC") to perform light work with only frequent stooping or crouching, and he could perform past relevant work and other jobs that exist in significant numbers in the national economy under sections 216(i) and 223(d) of the Social Security Act. (Tr. 13-26). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-3).

Plaintiff now appeals that decision directly to this Court, contending that the ALJ erred in assessing and considering: (1) the consistency of Plaintiff's allegations with the objective medical evidence; (2) an erroneous claim that Plaintiff's providers recommended he return to work; (3) evidence of medical improvement; (4) statements that Plaintiff was stable on his medication; (5) comments in one of Plaintiff's surgeon's treatment notes regarding Plaintiff's research of his condition; (6) a second surgeon's findings and opinion regarding the appropriate course of treatment; (7) Plaintiff's daily activities; and (8) a lack of medical opinion that Plaintiff cannot work. (Doc. 16). The Commissioner timely filed a brief in opposition to which Plaintiff filed a timely reply. (Docs. 21, 24).

### STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The scope of review is limited and, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

be conclusive[.]" *Id.* Accordingly, this Court is not tasked with determining whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the entire administrative record is taken into consideration, but the reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination[.]" *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). When an ALJ ignores an entire line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Ignoring evidence in this way requires the district court to remand to the agency. *Golembiewski*, 322 F.3d at 917.

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for *any* consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)) (emphasis in original).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by medically acceptable diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that is both substantial and gainful involving performing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

To render a decision after a Social Security hearing, an ALJ considers five questions in determining whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him or her unable to perform his or her past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Milhem v. Kijakazi,* 52 F.4th 688, 691 (7th Cir. 2022).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a

finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

## I.    Relevant Medical Records

Plaintiff has a history of lower back pain. (Tr. 328, 686). In 2014, he underwent a successful surgery for a large, herniated disc at L5-S1. (*Id.*). Starting at least a year before the alleged onset date, in 2018, Plaintiff visited his primary care provider, Jacob Ribbing, PA-C, on a monthly basis. (Tr. 661-685). PA Ribbing prescribed a combination opioid pain reliever, Norco, for Plaintiff's persistent back pain. (Tr. 684-685). Notes from their visits document that the pain medication helped Plaintiff over time allowing him to experience an improved quality of life and perform activities of daily living, while his condition appeared stable. (Tr. 661-685). PA Ribbing also documented limited range of motion and tenderness (lumbar paraspinal) with normal gait and ambulation in each visit. (*Id.*).

Despite his initial positive response to medication, Plaintiff's back pain worsened in May 2019. (Tr. 663). These complaints persuaded PA Ribbing to order an MRI. (*Id.*). Notably, even in this visit when Plaintiff reported worsening symptoms, PA Ribbing still

recorded, "Medication continues to improve patient quality of life and allow for ADLs." (*Id.*). The MRI showed a moderate to moderately severe bilateral foraminal stenosis at L5-S1. (Tr. 686-687). In a neurosurgery consultation, Plaintiff detailed his ongoing low back pain radiating to his right leg, walked with a limp, and presented with some lower extremity weakness. (Tr. 328-330). After speaking with Plaintiff and reviewing his MRI results, the consulting surgeon, Mark Fleming, M.D., assessed a recurrent disk rupture at L5-S1 and recommended L5-S1 fusion surgery. (*Id.*). Dr. Fleming performed surgery on Plaintiff on August 27, 2019—the alleged onset date. (Tr. 311-313).

In a post-operative follow-up appointment, Plaintiff described numbness and tingling in both legs. (Tr. 314). Subsequent imaging showed stable post-operative changes with no new issues. (Tr. 383-384). Two months after his surgery, Plaintiff reported lower leg pain, numbness, burning sensation, leg weakness, fatigue, tightness, and use of cane outside the house. (Tr. 303-304). During this follow-up visit, Plaintiff performed heel and toe walking without collapse, but lost strength in his quads during heel walking. (Tr. 304). After stabilization, he also walked, turned, stopped, sat, and stood with no observable difficulty or weakness. (*Id.*). From his physical observations and the post-operative imaging results, Dr. Fleming concluded, "I do not have an explanation for his described issues. The patterns are non-organic[,] and he uses terminology in describing his [symptoms] and situation that is medical and seems researched." (*Id.*).

Days later, Plaintiff met with Isaac Roberg, PA, and described dull, sharp, aching, and burning pain in his lower back and left leg, along with numbness and tingling sensations. (Tr. 300-303). Plaintiff rated his pain as a seven out of ten. (Tr. 300). PA Roberg

noted 3+/5 strength in Plaintiff's left lower extremity, absent reflexes at the ankles bilaterally, reduced sensation to light touch on the left lower extremity, tenderness over the paraspinal muscles on both sides, and an antalgic gait. (Tr. 302). The next month, Plaintiff received an MRI that revealed a broad-based eccentric disc protrusion resulting in moderate to severe effacement of the right S1 nerve root and moderate bilateral foraminal stenosis at L5. (Tr. 379-381).

At the end of October 2019, Plaintiff requested an extension for release from work, because his primary care provider originally only wrote for Plaintiff to stop working through October 27, 2019. (Tr. 299). Given his ongoing issues, he felt unprepared to return to work, and his primary care physician advised him to seek an extension from his post-operative care team. (*Id*.). In mid-November 2019, Plaintiff visited with PA Roberg again. (Tr. 296-298). The findings from the physical examination during this visit matched those from the prior appointment with PA Roberg. (Tr. 298). Plaintiff used a cane at this visit. (*Id*.). PA Roberg recommended physical therapy, a home exercise program, and follow-up with his surgeon. (*Id*.). During a follow-up in December 2019, Dr. Fleming noted that Plaintiff had been plagued since surgery with bilateral lower extremity symptoms suggesting possible complex regional pain syndrome ("CRPS") or autonomic hypersensitivity. (Tr. 550-551). Plaintiff appeared very upset about his symptoms and limitations, which Dr. Fleming acknowledged as understandable even though the examination and MRI appeared normal. (Tr. 551). Dr. Fleming referred Plaintiff to a pain management provider, Sahil Gupta, M.D. (Tr. 469, 551).

Plaintiff reported his pain to Dr. Gupta as ten out of ten with throbbing and

shooting sensations in his lower back radiating down the legs that was aggravated with walking or standing. (Tr. 469). After examination, Dr. Gupta noted a positive straight leg raise, normal gait, numbness, and burning pain to touch. (Tr. 471-472). He concluded that Plaintiff did not meet the criteria for CRPS, and that radicular etiology likely caused his pain rather than autonomic hyperactivity. (Tr. 472). As such, Dr. Gupta increased Plaintiff's Gabapentin dosage. (*Id.*).

In 2020, Plaintiff followed-up with PA Ribbing, Dr. Gupta, and Dr. Fleming several times. PA Ribbing continued to prescribe Norco and Gabapentin as pain medications in light of Plaintiff's "very bad experience from [his] surgery." (Tr. 648-650, 1364-1414). Within their in-person visits, PA Ribbing noted that Plaintiff was overweight, had an antalgic gait assisted by a cane, had limited range of motion, and experienced lumbar paraspinal tenderness. (Tr. 648-650, 1374-1383, 1403-1414). Just as in the pre-surgery visits, in each visit during 2020, PA Ribbing recorded, "Medication continues to improve patient quality of life and allow for ADLs." (Tr. 648-650, 1364-1383, 1403-1417). PA Ribbing assessed low back pain and herniation of lumbar intervertebral disc with sciatica. (*Id.*). Plaintiff expressed an interest in weening off the opioid medication and exploring medical marijuana. (*Id.*). Later in the year, the medical records reflect that Plaintiff reported his symptoms as stable with current medication doses and schedule. (Tr. 1364-1374, 1403-1417).

In follow-ups visits, Dr. Fleming documented normal exam findings other than hypersensitivity in a mixed L5-S1 pattern in both feet, severe discomfort, and Plaintiff's motivation to improve. (Tr. 708, 734-735, 945-946). Dr. Fleming felt that Plaintiff would

benefit from more aggressive, non-surgical measures to address his pain. (Tr. 708, 735). Plaintiff also met with Dr. Gupta intermittently. (Tr. 729-734, 943-945, 1241-1263, 1315, 1451-1455). Plaintiff presented with worsening pain below the knee and on top of his feet with only slight improvement with pain medication, burning leg pain, good strength, and pain on palpation of legs and feet. (Tr. 729-734, 943). Dr. Gupta noted positive straight leg raise bilaterally and continued use of Gabapentin. (Tr. 729-734). He treated Plaintiff with an epidural steroid injection at L5-S1 and increased his dosage of Gabapentin. (*Id.*). Plaintiff conveyed that the injection did not provide sustained relief, so Dr. Gupta decided to try a lumbar sympathetic nerve block. (Tr. 945, 1241-1263). In August 2020, Dr. Gupta documented that Plaintiff reported reduced pain and better relief from the steroid injection than the nerve block. (Tr. 1451).

Outside of these providers, Matthew Goodwin, M.D., evaluated Plaintiff in July 2020. (Tr. 1298-1303). Plaintiff told Dr. Goodwin about his injections and the slow improvement to his pain. (Tr. 1299). Dr. Goodwin recorded normal gait, good strength, decreased sensation to light touch at the L4-S1 dermatomes, weakness at S1 on the left with inability to perform single heel raise, mild straight leg raise bilaterally, trouble with heel to toe tandem walk, left side radicular pain, and weakness. (Tr. 1298-1303). Dr. Goodwin discouraged another surgery at that time because of the low overall benefit and high risk of further irritation of the nerve root. (Tr. 1302-1303). Plaintiff's MRI demonstrated multilevel degenerative disc disease, mild and moderate central spinal canal stenosis in his cervical spine, and mild spinal and bilateral neural foraminal stenosis in his thoracic spine. (Tr. 1396-1401).

In December 2020, Plaintiff presented for a work evaluation with J. Shawn Owens, OTR. (Tr. 1434-1437). Owens performed a material and non-material handling assessment that he used to complete an opinion questionnaire. (*Id.*). The record reflects that Plaintiff could occasionally lift and carry ten pounds or less, but never twenty pounds or more. (Tr. 1435). In an eight hour workday, Owens determined that Plaintiff could sit for six hours, stand or walk for two hours, and would require the option to sit or stand at will. (*Id.*). Plaintiff reported use of his cane when walking outside, but he did not use a cane during the evaluation. (Tr. 1436). Owens documented limitations with use of foot controls and postural limitations (marking "Rarely" for climbing ladders and scaffolds, kneeling crouching, crawling and "Occasionally" for climbing stairs and ramps, balance, and stooping) due to increased pain, altered sensation, limited strength and endurance, and limited range of motion. (Tr. 1436-1437).

## II.    State Agency Examiners

In March 2020, a Bureau of Disability Determination Services consultant, Adrian Feinerman, M.D., conducted a thirty-minute consultative exam on Plaintiff. (Tr. 929-938). Plaintiff reported that his pain radiated down his left lower extremity, that he used a cane for balance, that he could walk for fifty feet, stand for ten minutes, and sit for five minutes, and that squatting and bending caused back pain. (Tr. 930). Dr. Feinerman confirmed that Plaintiff could walk for fifty feet without his cane. (Tr. 934). He also recorded that Plaintiff had no issues standing on heels or toes or arising from a chair but met getting on and off the exam table and tandem walking with mild difficulty. (Tr. 934). Dr. Feinerman noted mild need for use of an assistive device. (Tr. 935). Plaintiff demonstrated normal muscle

strength and a negative standing leg raise in sitting and supine positions. (*Id.*). After the evaluation, Dr. Feinerman diagnosed Plaintiff with degenerative disc disease.

Reviewing physician Calixto Aquino, M.D., examined the medical file in March 2020 to assess Plaintiff's workplace abilities and found Plaintiff capable of performing light work limited to only frequent stooping and crouching. (Tr. 67-70). Upon review in September 2020, Frank Mikell, M.D., found the same. (Tr. 79-83).

III.    **Evidentiary Hearing**

Plaintiff appeared via telephone and was represented by counsel at the hearing on January 12, 2021. (Tr. 31-61). Vocational expert Sara Gibson also testified by telephone. (*Id.*).

Plaintiff testified that he attended school through the first two years of high school and eventually completed his GED years later. (Tr. 41). He previously worked at a nursing home as an activity director, moving his way from housekeeping to maintenance. (Tr. 41-42, 45). As an activity director, Plaintiff interacted with residents, scheduled and coordinated events, and prepared monthly event calendars. (Tr. 47). In the maintenance role, he handled the maintenance needs of the entire building, supervised several employees, coordinated logistics of maintenance tasks, and worked with other people to address issues outside his scope. (Tr. 46-47). He also helped with any random task that arose, including lifting residents weighing up to 400 pounds. (Tr. 47). Plaintiff eventually got laid off and lost his job. (Tr. 41-42). After brief unemployment, Plaintiff began working as a forklift driver at a warehouse. (Tr. 42). At the warehouse, he held various responsibilities, including lifting boxes up to 100 pounds. (Tr. 42-43). Plaintiff testified that he worked in this role for eight years, up until the day before his surgery. (*Id.*). After

the surgery, he did not attempt to return to work due to the severity of his pain but missed his former coworkers and friends at the warehouse. (Tr. 43).

Before the surgery relevant to this disability claim, Plaintiff testified that he had a prior surgery to address sciatic nerve pain down his right leg, which alleviated his symptoms for about five years. (Tr. 44). After that surgery, he returned to work without issue, and his life resumed as normal. (*Id.*). His second surgery, however, resulted in progressively worsening symptoms. (*Id.*). He awoke from surgery with pain in his left leg, which had no issues beforehand. (*Id.*). According to Plaintiff, his surgeon denied that the surgery caused any issues but permitted a nerve conduction study, which revealed recent nerve damage. (*Id.*). This nerve damage manifested as partial numbness from his knee down his legs and feet, along with weak thigh muscles and stabbing pains in his lower extremities. (*Id.*). Because of these issues, Plaintiff pursued legal action against his surgeon, which was unresolved. (*Id.*). His surgeon has since retired. (Tr. 50). He also saw a second surgeon, who uncovered that Plaintiff had three additional bulging discs in his back, arthritis, degenerative back disease, and narrowing of the spinal canal. (Tr. 52). This surgeon also conveyed to Plaintiff that another surgery may further irritate the nerve root. (Tr. 53).

Since his surgery, Plaintiff has not been able to perform any odd jobs. (Tr. 43). He testified that he experiences pain in his back and legs, numbness, balance issues, and. trouble sitting or standing for long periods of time. (Tr. 49). Within a few minutes of starting any activity, he described that his back tightens up and swells, pain runs down his legs and feet, a burning sensation forms in his heels, and a pins-and-needles feeling

lingers. (Tr. 54). He experienced these symptoms "every day, all the time." (*Id.*). His injuries sent him into a depression. (Tr. 49). From August 2019 until the hearing, Plaintiff's weight increased from 185 to 215 pounds due to limitations in his movement. (Tr. 38-39). He also discovered he had diabetes. (*Id.*). With the help of a pain management doctor, Plaintiff received back injections every three months, which typically provided a couple weeks of some relief. (Tr. 49, 54). He also took Gabapentin and Hydrocodone three times a day. (Tr. 49, 53). When walking on an uneven surface, like in his yard, Plaintiff required a cane. (Tr. 53). Plaintiff reported having to switch positions frequently to alleviate pain. (Tr. 55).

As to his daily life during the relevant time, Plaintiff reported that he took care of his children and tried to tackle a few chores around the house. (Tr. 50-51). Plaintiff had to take frequent breaks and sit in between household tasks. (Tr. 51). For example, he needed breaks in between tasks like loading the dishwasher, switching the laundry, and preparing lunch for his kids. (*Id.*). Plaintiff testified that his wife handled most of the household tasks, and he filled in when possible. (*Id.*). He assumed the responsibility of taking his kids to Taekwondo practice twice a week. (Tr. 52). As to social activities, Plaintiff described a virtually non-existent social life outside of his home, partially due to his inability to sit or stand for extended time and the unpredictable symptoms from his medicines. (Tr. 51). His main hobbies included spending time with his kids, playing cards and board games, and watching television. (Tr. 51-52).

Sara Gibson, the vocational expert, classified Plaintiff's past roles as an industrial truck operator, building maintenance supervisor, recreation leader, and housekeeping

cleaner. (Tr. 56-57). Gibson testified that an individual of Plaintiff's age, education, and work experience, who could perform light work and could frequently stoop and crouch, could perform Plaintiff's past roles of recreation leader or housekeeping cleaner. (Tr. 57). If the person could perform sedentary work and occasionally stoop and crouch, all of Plaintiff's past work would be precluded, but that person could perform other jobs including telephone clerk, charge account clerk, and order clerk. (Tr. 58). This is the case even if the person needed to sit and stand at will, so long as the person stayed at the workstation. (Tr. 59). But if the hypothetical person needed to leave the workstation to walk around or stretch about ten minutes per hour, then all jobs would be eliminated. (Tr. 60). Lastly, no jobs existed in the national economy for a person of Plaintiff's age, education, and work experience that required unscheduled breaks and at-will, unscheduled absences on an unpredictable basis and could not tolerate a standard work week of eight hours a day, five days a week. (Tr. 59).

## DECISION OF THE ALJ

In reaching his decision, the ALJ considered the hearing testimony from Plaintiff and the impartial vocational expert. He also considered Plaintiff's medical records and physicians' notes, and the evaluations of Adrian Feinerman, M.D., and J. Shawn Owens, OTR.

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since August 27, 2019. (Tr. 15). At step two, the ALJ determined that Plaintiff's lumbar degenerative disc disease status post multiple surgeries, thoracic degenerative disc disease, cervical degenerative disc disease, diabetes mellitus, and obesity constituted

severe impairments. (*Id.*). At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of one of the impairments listed in the regulations. (Tr. 16). At step four, the ALJ determined that Plaintiff could perform his past relevant work as generally performed as a recreation leader and housekeeping cleaner. (Tr. 24).

Finally, at step five, the ALJ concluded that Plaintiff had the RFC to perform light work, with only frequently stooping and crouching. (Tr. 16). The ALJ considered the evidence and found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 17). But the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 17, 22). Based on the testimony of the vocational expert, the ALJ concluded that, "considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] [was] capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (Tr. 26). The ALJ also found that Plaintiff's RFC allowed him to perform his past relevant work as a recreation leader and housekeeping cleaner as generally performed.

Considering all the above, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from August 27, 2019 through the date of the decision. (Tr. 26).

## DISCUSSION

Plaintiff argues that the ALJ's assessment of Plaintiff's subjective symptoms relied

on many factual and logical errors and, thus, was unsupported by substantial evidence. First, Plaintiff asserts that the ALJ failed to weigh the abnormal findings in Plaintiff's various medical appointments—lower left extremity weakness, antalgic gait, paraspinal tenderness, positive bilateral straight leg raise, consistent cane usage, and limited range of motion—with the normal findings to explain why such findings were inconsistent with Plaintiff's allegations. Likewise, Plaintiff emphasizes that the ALJ focused on evidence of improvement of Plaintiff's symptoms through surgery, injections, and medications, but failed to address the up and down nature of his progress. Plaintiff also notes that, even with some evidence of improvement, Plaintiff did not improve to a level permitting full-time work. Plaintiff contends that the ALJ ignored evidence of persistent symptoms despite treatment and improvement, including Plaintiff's report of temporary relief after injections, chronic pain, weakness, numbness, antalgic gait with use of cane, limited range of motion, limited functional capabilities, continued tenderness, and multiple recommendations for "more aggressive" approaches to pain management.

Next, Plaintiff challenges the ALJ's reliance on PA Ribbing's notation that Plaintiff reported his medications improved his quality of life and allowed activities of daily living. Plaintiff contends that this standard language appeared in every treatment note, including records prior to the alleged onset date and during the period just before Plaintiff's surgery. PA Ribbing used the same language to describe his pre-surgery and post-surgery conditions. The frequent and liberal use of this statement in PA Ribbing's notes, according to Plaintiff, renders it meaningless. Plaintiff also criticizes the ALJ's reliance on reports of "stability" to find his allegations inconsistent, as stability of

symptoms does not imply lack of ongoing pain.

Plaintiff further criticizes the ALJ's consideration of Dr. Fleming's treatment note regarding medical research indicating skepticism towards Plaintiff's pain complaints. According to Plaintiff, the ALJ highlighted this one-off comment and ignored many indications in subsequent records that Dr. Fleming believed Plaintiff's reports of pain, spent ample time reviewing his symptoms and medical options, and expressed sympathy for Plaintiff's surgical outcome and pain. Plaintiff also argues that the ALJ erred in how he considered Dr. Goodwin's treatment note regarding surgical recommendation. The ALJ simply stated that after Dr. Goodwin's assessment no additional surgery was recommended. But Dr. Goodwin recommended not rushing into surgery due to the risk and likelihood of further root irritation.

Turning to his daily activities, Plaintiff argues that the ALJ failed to explain how his self-described activities of daily living—household chores, general childcare, playing games, watching TV, and taking his kids to an extracurricular activity twice weekly—were inconsistent with his allegations. Further, Plaintiff emphasizes the ALJ discounted Plaintiff's evidence of limited daily activities because such activities could not be "objectively verified." Lastly, Plaintiff takes issue with the ALJ's statement that no reports by any treatment providers or reviewing physicians indicated that Plaintiff was unable to work. Plaintiff argues that such a statement would offer no value under the regulations anyway, and as such, could not be inconsistent with Plaintiff's allegations.

In response, the Commissioner argues that the ALJ explicitly stated that he considered the "entire record" to support his finding of ability to perform light range of

work with some postural limitations. Moreover, the Commissioner reasons that if the ALJ only credited the normal findings, he likely would have found Plaintiff to have a less restrictive range of work. Thus, the ALJ's finding demonstrates his consideration of both supporting and contrary evidence.

The Commissioner also stresses that the ALJ properly evaluated the evidence of improvement over time and stability on medication, without indicating full improvement or an overall lack of pain. Regarding PA Ribbing's notes, the Commissioner highlights that the ALJ properly considered the notation regarding improved quality of life and activities of daily living as it appeared in the record, and the ALJ did not wrongly assume that Plaintiff's medication completely alleviated his pain. As for Dr. Fleming's note regarding medical research, the Commissioner argues that a more reasonable reading of the ALJ's reference to this note is that Dr. Fleming evaluated Plaintiff's subjective complaints as inconsistent with the objective evidence.

Turning to Dr. Goodwin's documentation, the Commissioner claims that, though Plaintiff disagrees with the ALJ's assessment, it was supported by substantial evidence of both positive and negative findings and Plaintiff's reports of improvement. As to daily activities, the Commissioner states that the ALJ acknowledged Plaintiff's alleged limitations and did not equate them with the ability to perform full-time work. Finally, as to the ALJ's observation that the record contained no reports by any treating or reviewing physicians indicating an inability to work, the Commissioner contends that this averment was factual. The Commissioner urges that Plaintiff reads this statement too literally, and more likely, the ALJ simply noted that no medical provider had offered an

opinion with disabling restrictions. Overall, according to the Commissioner, the ALJ performed his role of assessing the consistency of Plaintiff's allegations with other evidence in the record as required.

Notably, both the Plaintiff and Commissioner agree that the ALJ mistakenly noted that Plaintiff was recommended to return to work in October 2019, as the record indicated that Plaintiff only had approval for FMLA leave through that date, which was later extended.

In review of the record and the ALJ's decision, the Court agrees with Plaintiff. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Here, the ALJ identified Plaintiff's benign surgical process and subsequent imaging results, normal gait, good strength, normal reflexes, slightly decreased sensation to light touch, and little trouble with heel and toe tandem walking as evidence that the lumbar surgery benefitted Plaintiff. Summarizing, the ALJ explained that the weight of the objective medical imaging and the findings and reports of Dr. Fleming, Dr. Gupta, and Dr. Goodwin did not support the severity of Plaintiff's lower extremity symptoms or the need for additional surgery as alleged.

From Dr. Fleming's notes, the ALJ pointed out that Plaintiff's complaints were not consistent with the dermatomal pattern and Plaintiff apparently conducted medical research. In error, the ALJ also stated that Plaintiff was recommended to return to work

in October 2019. In his consistency determination, the ALJ noted Plaintiff's reports of improvement in pain management with injections and good relief with epidural steroid injections. In reality, Plaintiff reported good relief with epidural steroid injections *in comparison to* the nerve block. Again, the ALJ highlighted normal gait, good strength, normal reflexes, and intact sensation to light touch and pinprick.

At one point, the ALJ did mention some increase in Gabapentin in the record and some reports of minimal improvement but stated that PA Ribbing continued to prescribe Gabapentin and Norco and recorded that these medications improved Plaintiff's quality of life and allowed for activities of daily living. To Plaintiff's point about that statement, it appears in every single note from PA Ribbing, even when the bulk of the note references persistent pain and minimal improvement. It appears to be a boilerplate notation. The Commissioner is correct that, just because this comment appears in each note, its veracity is not necessarily undermined. But the ALJ cherry-picked this notation, without reference to the many other symptoms and complaints in PA Ribbing's documentation to support his position multiple times throughout his decision. In reference to Plaintiff's use of a cane, the ALJ stated only that Plaintiff ambulated fifty feet without a cane in the consultative internal medicine examination and did not present with a cane during his occupational therapy evaluation.

Simply put, the ALJ failed to appropriately consider and evaluate the many examples of contrary evidence in the medical records, including objective evidence of Plaintiff's reported symptoms and limitations. While the ALJ summarized the medical records thoroughly, he failed to analyze, or perhaps explain, his analysis of the contrary

evidence in the record. It is unclear if or how he weighed this evidence at all, except to say that Plaintiff's allegations were inconsistent with the objective records. What is clear is that the ALJ improperly focused on the normal findings consistent with his ultimate conclusion. As highlighted by Plaintiff, the ALJ's opinion also contained several factual errors and mischaracterizations that impacted the analysis. Further, the ALJ erred in his handling of Plaintiff's testimony regarding daily activities. He offered no analysis, but simply stated that such testimony could not be objectively verified and that Plaintiff's testimony was unsupported by the medical evidence. This is not sufficient. *See Moore*, 743 F.3d at 1125.

Accordingly, the Court finds that the ALJ failed to build the required "logical bridge" from the evidence to his conclusion that Plaintiff has the ability to sustain full-time employment.

### CONCLUSION

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:   September 29, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**